UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KY D. MARTIN,

   Plaintiff,

  v.          Case No. 21-C-1481

FOREST COUNTY, et al.,

   Defendants.

## DECISION AND ORDER

This action arises out of the November 8, 2018, traffic stop and search of Plaintiff Ky Martin in Langlade County, Wisconsin, which led to a state charge of possession of controlled substances with intent to distribute. Martin brought this 42 U.S.C. § 1983 action against Defendants Forest County, Langlade County, Darrell Wilson, Thomas Robinson, Tony Crum, Travis Krueger, and Kevin Ison, asserting that Defendants violated his Fourth Amendment rights to be free from unreasonable searches and seizures and failed to intervene to prevent the violation of his rights. Martin additionally claims that the individual defendants acted in accordance with county policies and practices during the encounter and that the policies proximately caused the constitutional violations. He also asserts state law statutory claims against Defendants. The court has jurisdiction over Martin's § 1983 claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This matter comes before the court on Defendants' motion for summary judgment. The court held oral argument on the motion on June 7, 2023. For the following reasons, the motion will be granted and the case dismissed.

# BACKGROUND

Martin is an adult resident of Racine, Wisconsin. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, Dkt. No. 17. At all times relevant, Darrell Wilson, Thomas Robinson, and Tony Crum were employed by the Langlade County Sheriff's Office as law enforcement officers. *Id.* ¶ 4. Travis Krueger and Kevin Ison were employed by the Forest County Sheriff's Office as law enforcement officers. *Id.* ¶ 5.

On November 8, 2018, Sergeant Crum received an anonymous tip stating that a black Mercedes vehicle being driven by Ky Martin would be traveling to Mole Lake, Wisconsin on Wisconsin State Highway 55 and that it would be transporting heroin and crack cocaine. *Id.* ¶ 9. Sergeant Crum and Sergeant Robinson contacted Langlade County Sheriff's Office Lieutenant Dan Bauknecht to relay the tip. *Id.* ¶ 10. Lieutenant Bauknecht provided Sergeant Ison and Deputy Wilson with the information and directed them toward Wisconsin State Highway 55. *Id.* ¶ 11. Sergeant Ison spoke with Deputy Krueger about the tip, and Deputy Krueger was directed to drive toward the junction of Langlade County Highway K and Wisconsin State Highway 55. *Id.* ¶ 12.

At approximately 10:11 a.m., Deputy Krueger drove northbound on Langlade County Highway T near the junction of Wisconsin State Highway 55. *Id.* ¶ 13. There, he observed a black Mercedes vehicle traveling north on Wisconsin State Highway 55. *Id.* Deputy Krueger saw that the Mercedes did not have a front license plate, and he believed that the vehicle had excessively tinted windows. *Id.* ¶ 14.[1] Martin contends that his vehicle had the manufacturer's standard

---

[1] Although Martin challenged whether Deputy Krueger saw that the Mercedes did not have a front license plate before he initiated the stop at oral argument, he did not dispute Defendants' proposed finding of fact that Krueger saw that the front license plate was missing and then began following the Mercedes. Instead, he stated, "License plate not material; not asserted as a basis justifying a stop." Pl.'s Resp. to DPFOF ¶ 14, Dkt. No. 31. Defendants' proposed fact is therefore deemed true. Civil L.R. 56(b)(4).

window tint. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 2, Dkt. No. 31. In any event, Deputy Krueger began following the Mercedes and, upon conveying the license plate number to dispatch, learned that the vehicle was registered to Ky Martin. Deputy Krueger continued following the Mercedes and saw it drive on the yellow painted centerlines and weave in the lane of travel. DPFOF ¶ 15. Deputy Krueger initiated a traffic stop, and the Mercedes pulled to the side of the road. *Id.* ¶ 16; Krueger Aff., Ex. B. at 4:45.

Deputy Krueger made contact with the driver of the Mercedes, Ky Martin. DPFOF ¶ 17; Krueger Aff., Ex. B at 5:05. Deputy Krueger advised that he initiated the traffic stop because Martin's vehicle was weaving in the lane of travel, touched the centerline several times, and had excessive window tint. Krueger Aff., Ex. B at 5:08–18. Martin responded that he purchased the car with the windows already tinted. *Id.* at 5:18–25. He provided his driver's license, registration, and information regarding insurance for the vehicle. *Id.* at 5:40–55. Martin also apologized, stating that he was trying to pay attention to the GPS. *Id.* at 5:58–6:00. Deputy Krueger asked Martin where he was going, and Martin responded that he was going to a basketball tournament in Antigo to watch his little brother play but that he was currently on his way to the casino in Mole Lake. *Id.* at 6:00–24. Deputy Krueger asked Martin if he had an insurance card for the vehicle, and Martin provided a receipt showing that he paid his insurance for the next six months. *Id.* at 6:25–7:04. Deputy Krueger took the documentation to his squad car for review. *Id.* at 7:05. Based on the tip about the black Mercedes carrying narcotics, Deputy Krueger contacted dispatch and requested that the Forest County Sheriff's Office K-9 unit respond to the scene of the traffic stop. *Id.* at 7:25–54; DPFOF ¶ 18. Deputy Krueger then returned to Martin's vehicle and asked if Martin had any documentation showing that the insurance was for the Mercedes. Krueger Aff., Ex. B at 8:47–9:13. He explained that the receipt Martin provided only contained a policy number and did

3

not include the VIN number. *Id.* at 9:14. Martin provided additional documentation regarding his insurance, and Deputy Krueger returned to his squad car to review that information. *Id.* at 9:15–50. Deputy Krueger was in the process of issuing written warnings to Martin for excessive window tint and driving left of center when Sergeant Ison arrived at the scene, followed shortly by Deputy Wilson with the K-9 unit. DPFOF ¶ 19; Krueger Aff., Ex. B at 10:00–12:30.

Deputy Wilson made contact with Martin and directed that Martin exit the Mercedes and move to the front of Deputy Krueger's squad car for officer safety. DPFOF ¶ 21; Krueger Aff., Ex. B at 12:45. After Martin exited the vehicle and stood at the front of the squad car, Deputy Wilson performed an initial pat search of Martin's outer clothing, lasting approximately eight seconds, to search for weapons. DPFOF ¶ 22; Krueger Aff., Ex. B at 13:18–26. Then Deputy Wilson returned to his squad car and took K-9 Officer Leroy, a dual-trained narcotics and patrol dog, to perform a perimeter search of the Mercedes. DPFOF ¶ 23. As Deputy Wilson conducted the perimeter search, Deputy Krueger advised Martin that he was going to issue him a written warning for the left of center violation and asked for Martin's phone number. Krueger Aff., Ex. B at 14:07–25. Then Deputy Krueger returned to his squad car. *Id.*

In the meantime, K-9 Leroy indicated the presence of the odor of narcotics on the driver's side door seam. DPFOF ¶ 24. Deputy Wilson returned K-9 Leroy to the squad car and advised Deputy Krueger that K-9 Leroy indicated on the vehicle. *Id.* ¶ 25; Krueger Aff., Ex. B at 15:15–55. Deputy Wilson then advised Martin that he was being detained and placed him in handcuffs. DPFOF ¶ 26; *see also* Krueger Aff., Ex. B at 15:55.

Deputy Wilson acknowledged that he had already patted Martin down for weapons but asked Martin if he had anything illegal on him. DPFOF ¶ 28; Wilson Aff., Ex. C at 4:33–43. Martin responded that he did not. *Id.* Martin was wearing sweatpants with knee-length athletic

4

shorts and underwear. DPFOF ¶ 29. Deputy Wilson performed a second, more thorough pat-down search of Martin and felt a hard object near Martin's groin area. *Id.* ¶ 27; Wilson Aff., Ex. C at 4:44–5:34. Deputy Wilson asked twice what the object was, and Martin stated that it was his testicles. Wilson Aff., Ex. C at 5:35–45. Deputy Wilson explained that, since Martin had shorts on, he was going to have Martin lower his sweatpants. *Id.* at 5:46–54. Deputy Wilson lowered Martin's sweatpants to his ankles (Martin's shorts and underwear remained in place), conducted a further search, and again felt a hard object in Martin's groin area. *Id.* at 5:55–6:04; DPFOF ¶ 30. Deputy Wilson and Sergeant Ison continued to ask what the object was and explained that the search was necessary. Martin repeatedly stated that the object was his testicles. Wilson Aff., Ex. C at 6:05–6:59. Deputy Wilson stated that the concealed object was not consistent with human anatomy. *Id.* at 7:00–03. The officers advised that they were searching Martin before placing him in a squad car for their safety and his. *Id.* at 7:30–40.

Deputy Wilson moved Martin to a location between two open doors of Deputy Krueger's squad car for privacy and attempted to remove the concealed object from Martin's clothing. *See id.* at 8:18–9:47; DPFOF ¶ 33. Martin again stated that the object Deputy Wilson felt was his testicles. Wilson Aff., Ex. C at 9:49–53. The officers discussed the importance of removing the contraband for Martin's safety. They indicated the object could be a weapon or something he could ingest. *Id.* at 9:54–10:12. After Deputy Wilson was unsuccessful in removing the concealed object, Sergeant Crum suggested laying Martin on the ground to attempt to obtain the object. *Id.* at 10:13–11:27; DPFOF ¶ 34.

Martin was moved to the front of Deputy Krueger's squad car and assisted to the ground on the side of the road. DPFOF ¶ 35; Wilson Aff., Ex. C at 11:28–11:47. Once Martin was face down on the ground, Deputy Wilson attempted to remove the object. DPFOF ¶ 36; Wilson Aff.,

Ex. C at 11:48–12:00. Deputy Wilson tore the leg of Martin's underwear underneath his shorts. DPFOF ¶ 41; Wilson Aff., Ex. C at 12:01–16. Then Deputy Wilson removed the concealed object from Martin's underwear—a black sock containing hard objects. DPFOF ¶ 42; Wilson Aff., Ex. C at 12:17–35. An officer removed Martin's shoes and sweatpants to spread Martin's legs further apart. Wilson Aff., Ex. C at 12:36–48. Deputy Wilson searched once more for contraband and indicated that he did not feel anything else. *Id.* at 12:49–13:07. The sock removed from Martin's groin area contained four clear bags: the first bag weighed 2.7 grams and contained four individual bindles wrapped in tinfoil that tested positive for cocaine; the second bag weighed 8.15 grams and contained a hard, white substance that tested positive for cocaine; the third bag weighed 30.3 grams and contained a hard, white substance that tested positive for cocaine; and the fourth bag weighed 23.27 grams and contained a grayish/off white, hard substance that tested positive for heroin. Dkt. No. 21-2; DPFOF ¶ 44. Martin was placed under arrest. DPFOF ¶ 45. The Mercedes was searched and additional narcotics and a scale were located in the vehicle. *Id.* ¶ 46. In all, the officers located a total of 41.15 grams of cocaine, 23.27 grams of heroin, 2.22 grams of THC, and 1.47 grams of methylenedioxymethamphetamine (Ecstasy). Dkt. No. 21-2.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that

6

there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Fourth Amendment Claims

Although Martin was convicted in state court of possession of controlled substances with intent to deliver based on the evidence obtained as a result of the November 8, 2018 stop, Defendants have not argued that any of his claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Instead, Defendants contend that no violation of Martin's constitutional rights occurred. In view of the court's decision in *Mordi v. Zeigler*, 870 F.3d 703 (7th Cir. 2017), it appears the parties are correct and *Heck* would seem to pose no barrier to Martin's claims.

#### 1. Deputy Krueger's stop of Martin's vehicle

Martin argues that Deputy Krueger did not have a lawful basis to initiate the traffic stop. The Fourth Amendment guarantees the right of persons to be free from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. This protection "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v.*

7

*Arvizu*, 534 U.S. 266, 273 (2002). Thus, whenever a police officer decides to stop a vehicle, the stop must meet the reasonableness requirements of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). A law enforcement officer may stop a vehicle when there is probable cause or at least a reasonable suspicion to believe that the driver has committed a traffic violation or is otherwise involved in criminal conduct. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020); *see also Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). "Probable cause exists when, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Ochoa-Lopez*, 31 F.4th 1024, 1026–27 (7th Cir. 2022) (internal quotation marks and citation omitted). Probable cause supports the stop when an officer "reasonably believes that a driver has committed even a minor traffic offense." *United States v. Radford*, 39 F.4th 377, 384 (7th Cir. 2022) (citing *Whren v. United States*, 517 U.S. 806, 819 (1996); *United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014)).

Reasonable suspicion is a "less demanding" standard that "can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation altered). A reasonable suspicion means "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The reasonable suspicion inquiry "falls considerably short" of 51% accuracy; "[t]o be reasonable is not to be perfect." *Glover*, 140 S. Ct. at 1188 (quotation altered). "The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal

8

technicians, act." *Id.* (internal citations omitted). Rather than demand scientific certainty where none exists, courts "must permit officers to make commonsense judgments and inferences about human behavior." *Id.*

Deputy Krueger offered Martin two justifications for his decision to stop him: (1) operating left of center and (2) excessive window tint. Deputy Krueger also noted in his report that, when he was at the stop sign at Highway T and Highway 55, he observed the Mercedes traveling northbound on Highway 55 and that it did not have a front license plate, a violation of Wis. Stat. § 341.15(1). That statute provides that, "[w]henever 2 registration plates are issued for a vehicle, one plate shall be attached to the front and one to the rear of the vehicle." Wis. Stat. § 341.15(1). Martin does not dispute that his vehicle did not have a front license plate. Even though Deputy Krueger did not advise Martin that the lack of a front license plate was one of the reasons he initiated the traffic stop, Deputy Krueger had an articulable and reasonable suspicion that Martin was breaking the law based on that fact. *See Jackson*, 962 F.3d at 357 ("Even the reasonable belief that a driver committed a minor traffic infraction will support a stop. This is an objective standard, based upon the facts available to the officers at the moment of the seizure." (internal quotation marks and citation omitted)).

In addition, Deputy Krueger believed that the Mercedes had excessively tinted windows in violation of Wis. Admin. Code § Trans. 305.32(4)(b)2. Martin asserts that his vehicle had the manufacturer's standard window tint and therefore his windows were not excessively tinted. But the relevant inquiry is whether the officer reasonably believed he saw a traffic violation, not whether there was an actual violation of the law. *See United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022) (citation omitted); *see also United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient

9

basis to pull him over without violating the constitution."). In this case, Martin does not dispute that the Mercedes had tinted windows. A reasonable officer would have been justified in stopping the Mercedes based on observations of darkly tinted windows to investigate whether the windows were, in fact, excessively tinted.

Finally, Deputy Krueger stated that he observed Martin drive left of center. Under Wisconsin law, "[u]pon all roadways of sufficient width the operator of a vehicle shall drive on the right half of the roadway" subject to certain exceptions not relevant here. Wis. Stat. § 346.05(1). In other words, absent certain exceptions, Wisconsin law prohibits a person from operating left of center. *See State v. Popke*, 2009 WI 37, ¶ 15, 317 Wis. 2d 118, 765 N.W.2d 569. Martin asserts that merely "drifting to and fro in one's lane" does not give rise to even reasonable suspicion for a traffic stop. Pl.'s Br. at 3, Dkt. No. 30; *see State v. Post*, 2007 WI 60, ¶ 27, 301 Wis. 2d 1, 733 N.W.2d 634 (holding that "the determination of whether weaving within a single lane gives rise to reasonable suspicion requires an examination of the totality of the circumstances"). Deputy Krueger indicated that he observed Martin cross onto the painted double yellow lines separating the lanes of travel several times and weave in his own lane. *See* Krueger Aff., Ex. B at 1:50–4:43 (advising dispatch when Martin touched the center line and weaved in his lane of travel). Plaintiff does not dispute that he was driving on the yellow painted lines and weaving in the lane of travel. *See* Pl.'s Resp. to DPFOF ¶ 15. While the video evidence presented shows that the driver's-side tires of the Mercedes only briefly touch the center line a few times, the relevant question is whether the officer reasonably believed he saw a traffic violation. *See Yang*, 39 F.4th at 899 (citation omitted). "[E]ven a momentary crossing of the center line [is] sufficient for probable cause for a traffic stop." *State v. Puchacz*, 2010 WI App 30, ¶ 17, 323 Wis. 2d 741, 780 N.W.2d 536 (citing *Popke*, 317 Wis. 2d 118, ¶¶ 17–18). Moreover, weaving within

10

one's lane can be a sign of fatigue, inattention, or inebriation. Indeed, Martin told Deputy Krueger that he was he was trying to pay attention to the GPS. *See* Krueger Aff., Ex. B at 5:58–6:00. Under the totality of the circumstances, the court concludes that Deputy Krueger had at least a reasonable suspicion, if not probable cause, to initiate the traffic stop.

An officer who reasonably initiates a traffic stop "might violate the Constitution if he exceeds the scope or unreasonably prolongs the stop." *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019). Martin alleges in his complaint that the "extension of the traffic stop to conduct a dog sniff was illegal and unconstitutional." Compl. ¶ 47. Less than eight minutes passed between the time Deputy Krueger initiated the stop and Deputy Wilson approached Martin and directed that he exit his vehicle for the dog sniff. *See* Krueger Aff., Ex. B at 4:45–12:45. Deputy Krueger was still gathering information from Martin to issue the warning as Deputy Wilson and K-9 Leroy searched the perimeter of Martin's vehicle. *See id.* at 14:07–25. Deputy Wilson advised that K-9 Leroy indicated on the vehicle before Deputy Krueger completed the paperwork to issue the warning, approximately eleven minutes after Deputy Krueger initiated the stop. *See id.* at 15:49. Martin has not provided any basis to support his assertion that the stop was illegal and unconstitutional. In short, the stop was not prolonged past the time reasonably required to complete the mission of issuing Martin a warning.

### 2. Deputy Wilson's initial pat down search of Martin

Martin asserts that Deputy Wilson lacked authority to remove him from his vehicle and frisk him for weapons. After Deputy Wilson arrived at the scene with the K-9 unit, he directed Martin to exit the vehicle and move to the front of Deputy Krueger's squad car. Deputy Wilson then performed a pat search of Martin, lasting approximately eight seconds, to search for weapons.

11

It was not unreasonable for Deputy Wilson to direct Martin out of his vehicle. After all, "the Fourth Amendment permits officers to order drivers and passengers out of a car during a traffic stop to ensure officer safety." *United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022) (citing *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997)). "The power to conduct a *Terry* stop does not automatically give police the power to frisk the subject for weapons," however. *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27). An officer making a traffic stop may perform a protective pat-down of a driver "upon reasonable suspicion that they may be armed and dangerous.'" *United States v. Radford*, 39 F.4th 377, 384 (7th Cir. 2022). "Certainty about the presence of a weapon is unnecessary; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Ford*, 872 F.3d 412, 414–15 (7th Cir. 2017).

In this case, Deputy Wilson had reasonable suspicion to search Martin. Though Deputy Krueger initiated the stop for minor violations, the officers were investigating a tip that Martin would be driving a black Mercedes, traveling to Mole Lake, Wisconsin on Wisconsin State Highway 55, and transporting heroin and crack cocaine. Martin asserts that the tip was not reliable because Sergeant Crum did not identify the time he received the tip or the individual who made it.

It is true that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Alabama v. White*, 496 U.S. 325, 329 (1990) (citing *Illinois v. Gates*, 462 U.S. 213, 237 (1983)). But under appropriate circumstances, such as where officers corroborate details provided in the tip and the tipster accurately predicts future behavior that demonstrates he has a special familiarity with the subject, the tip may demonstrate "sufficient indicia of reliability" to establish reasonable suspicion. *Id.* at 332. In *Alabama v. White*, the anonymous tip was that "Vanessa White would be leaving 235–C Lynwood Terrace Apartments at a particular time in a

12

brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attaché case." *Id.* at 327. Police proceeded to the Lynwood Terrace Apartments and observed a brown Plymouth station wagon with a broken right taillight in the parking lot in front of the 235 building. They then saw White exit the 235 building and enter the station wagon but with nothing in her hands. The officers then followed the vehicle as it drove the most direct route to Dobey's Motel. When the vehicle reached the highway on which Dobey's Motel is located, the police stopped the vehicle. Police then found marijuana during a consensual search of a brown briefcase found in the car. *Id.*

In upholding the stop, the Court acknowledged that "the tip was not as detailed, and the corroboration was not as complete, as in *Gates*." *Id.* at 329. The Court also noted, however, that "the required degree of suspicion was likewise not as high." *Id.* As the Court explained, "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.* at 330. Given the degree of corroboration of the information provided in the tip, i.e., the apartment complex from which she would be leaving, the vehicle, the timeframe she would be leaving, and the destination to which she was headed, the Court concluded that "it is not unreasonable to conclude in this case that the independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller." *Id.* at 331–32.

13

Martin argues that this case is controlled by *Florida v. J.L.*, 529 U.S. 266 (2000), where the Court rejected the argument that an anonymous tip could provide the reasonable suspicion needed to justify a stop and frisk for weapons. In *J.L.*, the tip police received was that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Two officers who were instructed to respond arrived at the bus stop shortly thereafter and saw three black males, one of whom, J.L., a juvenile male, was wearing a plaid shirt. With no further information, one of the officers approached J.L., told him to put his hands on the bus stop, frisked him, and seized a gun from his pocket. *Id.*

The Court held that the tip failed to provide a reasonable suspicion and that the frisk therefore violated J.L.'s Fourth Amendment rights. In so ruling, the Court noted that the tip in J.L.'s case "lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case." *Id.* at 271. "The anonymous call concerning J.L.," the Court explained, "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* In other words, the tipster provided no more than a description of the person the tip was about. In *White*, on the other hand, the information provided by the tipster about the subject of the tip, including where she was coming from, the car she would be driving, and her destination, suggested "some familiarity with that person's affairs." *Id.* This was enough, though the Court noted it was a close case, to provide sufficient indicia of reliability for the tip in that case to justify an investigatory stop. No such detail was present in *J.L.*, and for this reason, the Court held the stop in that case was not justified.

The *J.L.* Court also emphasized, however, that its holding was limited to the required justification for a stop:

> Finally, the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord

14

with *Terry*, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in *Adams* and *White* does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.

*Id.* at 274.

In this case, by contrast, Deputy Krueger did not rely solely on the anonymous tip as authority for conducting the traffic stop. As noted above, Deputy Krueger cited Martin's apparent inattentive driving as well as the vehicle's excessively tinted windows as reasons for the stop. He also apparently had probable cause to believe Martin was in violation of Wisconsin's statute requiring a front license plate. Even if none of these reasons for the stop were sufficient to justify an initial pat search, by the time Deputy Wilson arrived at the scene, the anonymous tip that first alerted law enforcement to Martin did.

By that time, Deputy Krueger, who was acting on the tip, saw the black Mercedes driving on Wisconsin State Highway 55 just as the tipster had predicted. Deputy Krueger requested that dispatch run the license plate number of the vehicle and determined that the vehicle was registered to Ky Martin, the subject of the anonymous tip. Dkt. No. 21-2 at 1. When Deputy Krueger stopped the vehicle, the driver was identified as Ky Martin. *Id.* Martin stated that he was going to the casino in Mole Lake to pass some time, again as the tipster had said. *Id.* The anonymous tip was thus corroborated in every detail that could be corroborated prior to any search. The tipster also stated that Martin was transporting heroin and crack cocaine.

Under these circumstances, Deputy Wilson's brief and limited frisk for weapons was reasonable, "given the well-established relationship between drug trafficking and guns." *United States v. Price*, 184 F.3d 637, 642 (7th Cir. 1999) (citation omitted); *see also Cary v. City of Fond du Lac*, No. 19-CV-498, 2021 WL 1381190, at *7 (E.D. Wis. Apr. 12, 2021) ("The connection

15

between weapons and drugs . . . is so well-established that it hardly need be stated." (citing *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir. 1995)).  The anonymous tip, as corroborated by the officers' police work, demonstrated "sufficient indicia of reliability" to establish reasonable suspicion.  *White*, 496 U.S. at 332.  In addition, the stop occurred in a rural, remote area, Martin was not handcuffed at the time of the pat down, and he was able to move around.  Under these circumstances, the brief pat-down for weapons was not unreasonable.

### 3. Deputy Wilson's search of Martin's person

Martin next asserts that the second, more thorough search of his person was unjustified and conducted in an unreasonable manner.  But by this time, police had probable cause to arrest Martin.  An alert from an adequately trained and reliable drug-detection dog is "sufficient to give rise to a finding of probable cause."  *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015) (citation omitted).  The drug-detection dog alerted on the seam of the driver door of Martin's vehicle, which further corroborated the tip that Martin was transporting heroin and crack cocaine.  As explained above, the stop was not unreasonably prolonged to accommodate the use of the drug-detection dog.  Once the dog alerted at the driver door, the facts available to Deputy Wilson would warrant a person of reasonable caution in the belief that contraband or evidence of a crime was present.  *See Harris*, 568 U.S. at 243.  As a result, Deputy Wilson had probable cause to arrest Martin and conduct a full search of his person.  *United States v. Robinson*, 414 U.S. 218, 225 (1973).  Yet, a full search of Martin is not what Deputy Wilson did.

After K-9 Leroy indicated on Martin's vehicle, Deputy Wilson advised Martin that he was being detained and placed him in handcuffs.  Although Deputy Wilson may have told Martin he was not being arrested, this was an arrest.  *See Mwangangi v. Nielsen*, 48 F.4th 816, 826–27 (7th Cir. 2022) ("While there is no categorical rule that an officer's decision to place a suspect in

16

handcuffs always transforms the interaction from a *Terry* stop into an arrest, it is the 'rare case' in which 'common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only in this manner.'" (quoting *United States v. Glenna*, 878 F.2d 967, 973 (7th Cir. 1989))).  As a result, Deputy Wilson would have been justified in conducting a full search of Martin's person.  *See United States v. Trigg*, 878 F.2d 1037, 1039 (7th Cir. 1989) ("Under this exception, a police officer may thoroughly search the person of a suspect after making a custodial arrest.").  Instead, Deputy Wilson chose to conduct a more thorough protective frisk before placing Martin in a squad car.

 Martin contends that the second search was unreasonably conducted by Deputy Wilson.  To determine whether a search is reasonable "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (citation omitted).  Before Deputy Wilson conducted the search, Martin denied that he had anything concealed inside of his clothing.  As Deputy Wilson conducted the second pat down of Martin's outer clothing, he came across a hard, suspicious object near Martin's groin area.  Martin repeatedly stated that the object Deputy Wilson felt was his testicles or his penis, but Deputy Wilson could tell by the feel that the object was not part of Martin's anatomy.  Based on his training and experience, Deputy Wilson feared the object could be either a weapon that could be used on police or drugs that Martin could ingest.

Deputy Wilson moved Martin to a location between two open doors of a squad car for privacy and attempted to remove the concealed object from Martin's clothing.  Though Deputy Wilson lowered Martin's sweatpants to his ankles to further search Martin's groin area, Martin's

17

shorts and underwear remained in place. After the officers were unsuccessful in removing the concealed object, Sergeant Crum suggested laying Martin on the ground, and Martin was assisted to the ground on the side of the road in front of Deputy Krueger's squad car. Once Martin was face down on the ground, Deputy Wilson attempted to remove the object by tearing the leg of Martin's underwear. He ultimately removed the concealed black sock containing heroin and crack cocaine from Martin's underwear.

Martin argues that the public search, which he equates to a strip search, was intrusive and unreasonable. Deputy Wilson, having just encountered a suspicious object near Martin's groin, had reason to believe that Martin had a weapon or contraband hidden in his underwear. Although Martin was searched in a public area on the side of the road, officers attempted to obscure the search from public view by placing Martin between two open squad car doors and surrounding him with officers. Only male officers were present during the search. Deputy Wilson lowered Martin's sweatpants and ripped his underwear only after he made numerous unsuccessful attempts to retrieve the contraband. In any event, Martin's shorts remained in place during the sock's removal; at no point were his buttocks or genitals exposed to view, even to the officers present on the scene. By choosing to conceal contraband in such an intimate place on his body, Martin made necessary the very type of intrusion he now condemns as unreasonable and inhumane. There is no evidence that the search was conducted for the purpose of humiliating or degrading Martin. Under the totality of the circumstances, the search and seizure were performed in a reasonable manner.

## B. Qualified Immunity

Defendants argue, in the alternative, that Martin's claims should be dismissed because Deputies Krueger and Wilson are immune from civil liability for any constitutional violation that

may have occurred. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). The doctrine reflects an accommodation between the public interest in safeguarding constitutional guarantees on the one hand, and on the other, the concern that subjecting government officials to personal liability and harassing litigation would inhibit them in the performance of their duties. *Id.*

Although qualified immunity is a defense to a § 1983 suit, the plaintiff has the burden to overcome the defense. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). The plaintiff must show the deprivation of a constitutional or statutory right and the right must be clearly established at the time of the defendants' conduct. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). While a plaintiff is not required to present a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). In recent years, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" and has reversed federal courts in qualified immunity cases where the lower courts "wrongly subject individual officers to liability." *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 & n.3 (2015) (quotation marks omitted). The Supreme Court has instructed: "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or

19

constitutional question beyond debate. This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citation omitted).

In other words, the court must determine whether a constitutional rule applies with obvious clarity such that it placed the officers in this case on notice that their conduct was unlawful. Martin asserts that Defendants' arguments for qualified immunity should be rejected "out of hand" because the issue is "beyond debate." Pl.'s Br. at 7. But as the above discussion demonstrates, Martin has not identified, and the court has not found, a controlling case or robust collection of persuasive authority analogous to the set of facts presented here that clearly establishes that Defendants' conduct violated Martin's constitutional rights. Because Martin has failed to identify controlling precedent that "squarely governs the specific facts at issue," *Kisela*, 138 S. Ct. at 1152, Deputies Krueger and Wilson are entitled to qualified immunity. For this reason, as well, Defendants' motion for summary judgment as to Martin's claims against Deputies Krueger and Wilson is granted.

## C. Remaining Federal Claims

Martin claims that the officers who watched the searches failed to intervene. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Martin's failure to intervene claim fails because there is no underlying

violation. *See Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004). Thus, Defendants are entitled to summary judgment on this claim.

Martin also asserts a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the counties based on Forest County's search policies and Langlade County's established agreement and cooperation with those policies. But the counties "cannot be liable under *Monell* when there is no underlying constitutional violation." *Gonzalez v. McHenry Cty., Illinois*, 40 F.4th 824, 830 (7th Cir. 2022) (quoting *Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir. 2010)). The officers did not violate Martin's constitutional rights; therefore, Martin's *Monell* claim fails. For these reasons, Defendants' motion for summary judgment on Martin's federal claims is granted.

### D. State Law Claims

Martin has also alleged state law claims against Defendants. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). The court follows this presumption and declines to exercise supplemental jurisdiction over Martin's state law claims. Accordingly, Martin's state law claims against Defendants are dismissed without prejudice so that they may be pursued in a state forum.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 15) is **GRANTED** with respect to Martin's federal claims, and such claims are **DISMISSED**. The state law claims are **DISMISSED without prejudice**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this <u>16th</u> day of June, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge